UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                                                 Plaintiff

v.                                                                  Criminal Action No. 4:22-cr-3-RGJ

CEDRIC SWANAGAN                                                                         Defendant
COURTLAND REED

\* \* \* \* \*

## MEMORANDUM OPINION AND ORDER

A trial was held on Count 3 and Count 4 of the Second Superseding Indictment beginning on September 18, 2023 and concluding on September 21, 2023. [DE 330]. Count 3 and Count 4 charged Cedric Swanagan ("Swanagan") and Courtland Reed ("Reed") (collectively, "Defendants") with Conspiracy to Possess with Intent to Distribute methamphetamine and Possession with Intent to Distribute methamphetamine. [DE 245]. The jury returned a verdict of Guilty on Count 3 and Count 4 with respect to both Defendants. [DE 319].

**I.      The Jury Pool Challenge**

On September 18, 2023, jury selection began in Defendants' trial. Before the jury pool was brought into the courtroom, Defendants challenged the composition of the jury pool asserting that it was not a fair cross-section of the community. Defense counsel for Swanagan noted that there was a "total of three possibly four African Americans in the entire panel" and Reed's counsel joined in the motion. The United States objected, arguing that the Court followed an appropriate district-wide selection plan. The Court construed the challenge under the Jury Selection and Service Act ("JSSA") but also considered the challenge under the Sixth Amendment and equal protection clause.

The JSSA provides that it "is the policy of the United States that all litigants in Federal courts entitled to trial by jury shall have the right to . . . petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861. The JSSA also prohibits the exclusion of any citizen "from service as a . . . petit juror . . . on account of race [or] color[.]" 28 U.S.C. § 1862. If a defendant wishes to make a JSSA challenge, 28 U.S.C. § 1867 provides the "exclusive means" for "challenging compliance with selection procedures." *See United States v. Johnson*, 40 F. App'x 93, 96 (6th Cir. 2002).

Challenges to the composition of a jury pool may be brought under the Sixth Amendment, equal protection clause, or JSSA. "Typically, challenges brought under the JSSA are reviewed under the same standard as a Sixth Amendment claim of denial of a jury representing a fair cross section of the community, which requires a showing of underrepresentation of a distinct group." *United States v. Ovalle*, 136 F.3d 1092, 1099 (6th Cir. 1998); s*ee also United States v. Allen*, 160 F.3d 1096, 1102 (6th Cir. 1998) (explaining the JSSA test is "essentially identical" to the Sixth Amendment test); *United States v. Wesley*, No. 15-cr-20718, 2017 WL 2590487, at *6 (E.D. Mich. June 15, 2017) (holding the same "standard applies regardless of whether the claim is brought under the Sixth Amendment or the [JSSA]"). That is the case "because the purpose of the Sixth Amendment and the [JSSA], and § 1861 in particular, is to entitle litigants in federal court to 'the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes.'" *Ovalle*, 136 F.3d at 1099.

Under the Sixth Amendment, to make a *prima facie* showing of a fair cross-section violation, a defendant must prove:

> (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and (3) that this

underrepresentation is due to systematic exclusion of the group in the jury-selection process.

*Allen*, 160 F.3d at 1103 (quoting *Duren v. Missouri*, 439 U.S. 357, 364 (1979)). Therefore, because the same standard applies, "a defendant must show that the district's jury selection plan fails to comply substantially with the Act" to prove a violation of the JSSA. *Id.* at 1102.

As Defendants' challenge was made "before the voir dire examination begins, or within seven days after [Defendants] discovered or could have discovered . . . the grounds therefor, whichever is earlier," the Court considered the motion under the JSSA. 28 U.S.C. § 1867. The JSSA's timeliness requirement "is to be strictly construed, and failure to comply precisely with its terms forecloses a challenge under the Act." *Ovalle*, 136 F.3d at 1098; *see also United States v. Young*, 570 F.2d 152, 153 (6th Cir. 1978) (per curiam) (holding strict compliance with time limits of Act is required).

While Defendants demonstrated that the underrepresented group was "distinctive" (African Americans), and that their representation was less than that in the community at large,[1] precedent confirms that so long as the Court created the pool using a permissible selection plan, the fact that the venire did not exactly reflect the racial demographics of the community does not violate the JSSA. *See Taylor v. Louisiana*, 419 U.S. 522, 538 (1975) (explaining there is "no requirement that petit juries actually chosen must mirror the community" and "[d]efendants are not entitled to a jury of any particular composition"); *Duren*, 439 U.S. at 366 ("systematic exclusion" means what is "inherent in the particular jury-selection process utilized"). Even if the percentage of African Americans represented in the jury pool was small, African Americans were

---

[1] The Jury Qualification Questionnaire showed the pool of prospective jurors contained only 2 Black or African American members (1.63%) and 3 Multi-Race members (2.44%).

not systematically excluded.² *See Allen*, 160 F.3d at 1104 ("[Defendants] must show that the underrepresentation is inherent in the jury selection process used."). Defendants made no such showing to the contrary, and as a result the Court denied the challenge under the JSSA and Sixth Amendment.

The Court also denied the challenge on equal protection grounds. The test for this challenge is similar in that "[a] defendant challenging a venire on equal protection grounds bears the burden of showing that the venire was selected in an intentionally discriminatory manner." *Id.* (citing *Batson v. Kentucky*, 476 U.S. 79, 93 (1986)). The Sixth Circuit has articulated the three-part test:

> First, [Defendants] must establish that the group excluded from the grand jury is one that is a recognizable, distinct class capable of being singled out for different treatment under the laws. Second, [Defendants] must establish that the selection procedure used by the state to select grand juries is susceptible to abuse or is not racially neutral. Finally, [Defendants] must establish the degree of underrepresentation occurring over a significant period of time by comparing the proportion of the excluded group in the total population to the proportion serving as grand jurors.

*Ovalle*, 136 F.3d at 1104 (quoting *Jefferson v. Morgan*, 962 F.2d 1185, 1188-89 (6th Cir. 1992)).

For the same reasons, the Court denied the challenge because the Court relied on its standard selection plan to create the venire, and no distinct group was systematically excluded. The plan for randomized selection used by the Court is racially neutral, and Defendants presented no evidence to the contrary. As a result, the Court denied the motion on equal protection grounds as well.

---

² The Court follows the Western District of Kentucky's Plan for the Qualification and Random Selection of Grand and Petit Jurors. United States District Court Western District of Kentucky, General Order 2021-01, https://www.kywd.uscourts.gov/general-orders-2021 (last visited Oct. 5, 2023). This plan was approved by the Judicial Council of the Sixth Circuit and has been in effect since 2021.

## II.     The Individual Juror Challenges

While, as a general policy, the Court does not allow jurors to see a defendant outside the courtroom, "[i]t is not inherently prejudicial to bring a defendant to the courthouse or courtroom in custody as a security measure." *United States v. Barger*, 931 F.2d 359, 371 (6th Cir. 1991). And while it is never intended for jurors to see a defendant in shackles, "[the Sixth Circuit] long ago concluded that 'a brief and fortuitous [viewing of the defendant in shackles] is not prejudicial and requires an affirmative showing of prejudice by the defendant.'" *Keys v. Booker*, 798 F.3d 442, 455 (6th Cir. 2015) (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 109 (6th Cir. 1973)); *see also United States v. Watts*, No. 21-5302, 2022 WL 706603, at *7 (6th Cir. Mar. 9, 2022) ("[W]e do not assume prejudice when a juror inadvertently sees the defendant in shackles for a brief period elsewhere in the courthouse[.]") (quotations omitted); *United States v. Gayles*, 1 F.3d 735, 739 (8th Cir. 1993) (When a view of a defendant is "brief, inadvertent, and outside the courtroom, prejudice to the defendant is slight."); *United States v. Jones*, 468 F.3d 704, 709 (10th Cir. 2006) ("In itself, a juror's brief view of a defendant in shackles does not qualify as a due process violation...."); *Ghent v. Woodford*, 279 F.3d 1121, 1133 (9th Cir. 2002) (no constitutional violation where "a few jurors at most" saw defendant in the hallway entering courtroom in shackles).

Furthermore, whatever slight prejudice that could arise from a brief viewing of a defendant in shackles outside the courtroom can be cured by a proper voir dire of the jurors in question. *See Barger*, 931 F.2d at 371-72 (holding that a defendant did not show prejudice where a trial court questioned a juror after he disclosed he had viewed the defendant during voir dire); *see also United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1977) (defendant was not denied a fair trial after being viewed by jury in handcuffs given trial judge's remedial measures); *United States v. Fahnbulleh*, 748 F.2d 473, 477 (8th Cir. 1984) ("If any prejudice was created by the brief and

inadvertent handcuffing incident, it was dispelled when the district judge conducted a thorough voir dire of the jury panel and dismissed both prospective jurors who indicated that they saw the defendants outside the courtroom."). When a trial court promptly addresses an inadvertent viewing of a defendant in shackles by questioning the venire, the Sixth Circuit has held that a defendant is not unduly prejudiced by it. *See Barger*, 931 F.2d at 371 ("The trial judge in this instance questioned the juror in front of defense counsel, who did not object to the judge's handling of the matter. We reject the appellant's contention that he was prejudiced by this situation."); *see also Watts*, 2022 WL 70663, at *2 (holding defendant was not prejudiced where "the court questioned the juror about the incident" and the juror did not see anything "unusual" or "significant"); *United States v. Crane*, 499 F.2d 1385, 1389 (6th Cir. 1974) (defendant was not prejudiced by three jurors briefly viewing defendants in handcuffs on their way to the courtroom where trial judge questioned jurors afterward).

On September 19, 2023, before trial resumed, three jurors had a brief opportunity to view Defendants in jail clothes and handcuffs as they entered the courthouse. The lobby to the Owensboro Division Courthouse contains a security checkpoint at the front door as well as an elevator just beyond the security checkpoint. At approximately 8:00 a.m., security camera footage[3] revealed that three jurors—Juror # 75, Juror # 98, and Juror # 22—arrived at or passed through the security checkpoint while Defendants were brought through the lobby to the elevator. After learning of this occurrence, Defendants challenged the continued participation of these three jurors

---

[3] *See* Exhibit 1 [DE 331]. Once the Court became aware of the incident, the Court *sua sponte* requested to view all camera footage of the incident to ensure that all members of the jury who were passing through the security checkpoint at the time the Defendants were transported through the lobby were identified and questioned. The record reflects that all counsel was invited to view the security footage with the Court and agreed that these three individuals were in the lobby at the time and may have viewed the Defendants in their custodial status. While Defendants also asserted that jurors on the sidewalk outside the building viewed them in the side parking lot being taken out of the transport van, the Court determined by time stamp that these were the only jurors entering the building during that time frame.

on the jury. The Court separated those three individuals from the rest of the jury and placed a Court Security Officer with the jury to ensure that no members of the jury discussed the occurrence in the courthouse lobby. The Court then questioned each of the three jurors who had an opportunity to view the Defendants entering the courthouse one at a time. Counsel for the United States and Defendants were given the opportunity to consult with the Court and suggest questions throughout.

First, the Court questioned Juror # 75. He indicated that he saw prisoners entering with law enforcement officers when he arrived inside the courthouse entrance. However, Juror # 75 stated that he did not pay much attention to them, did not recognize them, and could not describe how they were dressed. He also confirmed that he could continue as an impartial juror, and nothing about his experience entering the courthouse that morning would affect his ability to serve on the jury.

Next, the Court questioned Juror # 98. This juror also recalled seeing people in handcuffs walk by upon entering the courthouse, and similarly did not recognize them because he "didn't look." He remembered they were wearing a jumpsuit but could not recall the color because he "didn't look very well." He also confirmed that he could remain impartial and his experience did not impact his ability to follow the Court's instructions and sit on the jury.

Finally, the Court questioned Juror # 22. This juror saw no one other than another person entering the courthouse going through security. He explained that he kept to himself and that nothing notable occurred on his way inside the courthouse. Even when the Court inquired about potential discussion in the jury room about entering the courthouse that morning, Juror # 22 said the only discussion was about whether a particular juror did not go through security.

Upon observing the demeanor and evaluating the credibility of each juror, the Court determined that they could continue as part of the jury because there was no affirmative showing

of prejudice. *See Watts*, 2022 WL 706603, at *7 (*"*When the 'conditions under which defendants were seen were routine security measures rather than situations of unusual restraint such as shackling during trial,' the defendant must show actual prejudice.") (quoting *United States v. Waldon*, 206 F.3d 597, 607 (6th Cir. 2000)).  Only two of the jurors (Juror # 75 and Juror # 98) recalled seeing in-custody individuals at all, and both were unable to recognize them or recall any identifying details, such as the color of their jumpsuits.  Juror # 22 did not see anyone of note when entering the courthouse and did not report seeing Defendants at all.  He also seemed to believe that the Court's questioning, rather than being about Defendants, was about whether all the jurors went through security that morning.

For Juror # 75 and Juror # 98, not only was the opportunity to view Defendants "brief," as in *Kennedy*, but it also took place outside the courtroom.  Although Juror # 75 and Juror # 98 saw Defendants, they did not identify them and only thought of them as "prisoners."  Jurors are typically unfamiliar with the courthouse, and it is plausible that without a clearer or prolonged view, Defendants would have appeared to be *any* individuals in custody.  Indeed, Juror # 98 did not get a long enough look to remember the color of their jumpsuits.  In fact, while two of the jurors saw men in shackles, the three jurors never once indicated they believed they had seen *Defendants* outside the courtroom.  Even if they had identified Defendants, the Court took the extra step of ensuring that they could remain fair and impartial and ignore Defendants' custodial status.  *See Barger*, 931 F.2d at 371 ("The trial judge asked the juror whether he could completely disregard what he saw and the juror responded that it did not affect him at all."); *Watts*, 2022 WL 706603, at *7 ("[E]ven if the juror saw the handcuffs, he assured the court that he would remain fair and impartial[.]").  And throughout the questioning of each juror, counsel was allowed to suggest questions of their own.  *See Barger*, 931 F.2d at 371 ("All defense counsel were present

during the questioning, and the judge consulted with them so [she] could ask any questions they had."). It is also notable that Juror # 75 did not take part in deliberation because he was one of two jurors selected at random as an alternate.

After a thorough voir dire of Juror # 75, Juror # 98, and Juror # 22 which provided an opportunity to closely assess their credibility and demeanor, the Court found that there had been no "affirmative showing of prejudice." Accordingly, the Court denied the challenge to the three individual jurors.

### III. Conclusion

For all these reasons, and the Court being otherwise sufficiently advised, Defendants' fair cross-section challenge to the venire under the JSSA, Sixth Amendment, and equal protection clause was **DENIED**, and Defendants' challenge to the three individual jurors who had an opportunity to view Defendants in shackles was **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

October 19, 2023