UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

UNITED STATES OF AMERICA                                   Plaintiff

v.                                          Criminal Action No. 4:22-cr-3-RGJ

CEDRIC SWANAGAN                                            Defendants
COURTLAND REED

* * * * *

**MEMORANDUM OPINION AND ORDER**

A trial was held on Count 3 and Count 4 of the second superseding indictment beginning

September 18, 2023 and concluding September 21, 2023.  [DE 330].  Count 3 and Count 4 charged

Cedric Swanagan ("Swanagan") and Courtland Reed ("Reed") (collectively, "Defendants") with

conspiracy to possess with intent to distribute methamphetamine and possession with intent to

distribute methamphetamine.  [DE 245].  The jury returned a verdict of Guilty on Count 3 and

Count 4 with respect to both Defendants.  [DE 319].  Now, Defendants renew their Rule 29 motions

for judgment of acquittal and move separately for a new trial on the basis that (1) three individual

jurors' viewing of Defendants in shackles and jail clothes outside the courtroom was prejudicial

and (2) witnesses for the United States should not have been permitted to interpret wiretap

recordings involving Defendants.  [DE 327; DE 329].  The United States did not file a response

and the time to do so has passed.  For the reasons below, Defendants' motions are **DENIED**.

I.       **Rule 29 Motions for Judgment of Acquittal**

A court should grant a motion for judgment of acquittal under Rule 29 only when the

evidence admitted at trial, viewed in the light most favorable to the United States, was insufficient

to permit a rational trier of fact to find guilt beyond a reasonable doubt.  *United States v. Connery*,

867 F.2d 929, 930 (6th Cir. 1989) (citations omitted).  Put differently, a court should not grant a

motion of acquittal unless "'the prosecution's failure is clear.'"  *Id.*  (quoting *Burks v. United States*, 437 U.S. 1, 17 (1978)).  In evaluating challenges to sufficiency of the evidence, a court must not "weigh the evidence presented, consider the credibility of witnesses, or substitute [its] judgment for that of the jury."  *United States v. Siemaszko*, 612 F.3d 450, 462 (6th Cir. 2010) (citations and quotation omitted).  "Circumstantial evidence alone is sufficient to sustain a conviction and such evidence need not 'remove every reasonable hypothesis except that of guilt.'" *United States v. Meyer*, 359 F.3d 820, 826 (6th Cir. 2004) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989) (citation and quotation omitted)).

Defendants argue that the evidence before the jury was insufficient for any reasonable juror to sustain a conviction.  [DE 329 at 1625–27; DE 327 at 1607–08].  Reed argues that the United States presented insufficient evidence to show that he joined the conspiracy or had possession of methamphetamine, relying on the fact that no "physical evidence" showed Reed possessing methamphetamine, and asserting that only the wiretapped conversations tied Reed to the crimes. [DE 327 at 1608–09].  Swanagan also argues that the evidence never showed him in physical possession of methamphetamine, and that only the wiretapped conversations and testimony of co-defendant Nicole Toliver ("Toliver") tied him to the crimes.  [DE 329 at 1625–26].

As to Swanagan's argument that Toliver was not credible, the Court cannot weigh witness credibility or the weight of evidence on a Rule 29 motion.  *See Siemaszko*, 612 F.3d at 462.  The Court does not dispute that Swanagan impeached Toliver on certain details of her testimony and that she admitted there were circumstances under which she would have lied to protect herself. [*See* DE 329, n. 5, 6].  But the jury was still entitled to credit or discredit whichever parts of her testimony it believed.  *See United States v. Hughes*, 505 F.3d 578, 592 (6th Cir. 2007) ("Because the issue is one of legal sufficiency, the court neither 'independently weighs the evidence, nor

judges the credibility of witnesses who testified at trial.'") (quoting *United States v. Talley*, 164 F.3d 989, 996 (6th Cir.1999)).  And Toliver was not the only cooperating co-defendant to testify— Birdie Lawless ("Lawless") also testified.

Both Defendants argue that the wiretapped calls could not support a conviction.  The United States put forth voluminous evidence of calls between, *inter alia*, Swanagan and Lawless, Swanagan and Tolliver, Swanagan and Reed, and Swanagan and Nicholas Stallings.  A reasonable juror could have been convinced of Defendants' guilt based on these calls alone.  *See Meyer*, 359 F.3d at 826 (holding "circumstantial evidence alone" is enough to support a conviction); *United States v. Walls*, 293 F.3d 959, 967 (6th Cir. 2002) ("A conspiracy may be inferred from circumstantial evidence which may reasonably be interpreted as participation in a common plan.") (citing *United States v. Blakeney*, 942 F.2d 1001, 1010 (6th Cir.1991)).  And evidence of physical possession is unnecessary—the United States also could have established *constructive* possession of the methamphetamine, a theory that the jury was explicitly instructed on.  [DE 317 at 1535–36].  Just as a conspiracy can be inferred from circumstantial evidence, so to can constructive possession.  *See United States v. Raymore*, 965 F.3d 475, 484 (6th Cir. 2020) ("The jury can find both actual and constructive possession with direct or circumstantial evidence.") (citation omitted).  As a result, Defendants have not carried their burden of showing the evidence, when viewed in the light most favorable to the United States, was insufficient for any reasonable juror to convict on either count.  Accordingly, Defendants' Rule 29 motions for judgment of acquittal are **DENIED**.

## II.      Rule 33 Motions for New Trial

Federal Rule of Criminal Procedure 33 provides that "[u]pon the defendant's motion, [a district] court may vacate any judgment and grant a new trial if the interest of justice so requires." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (quoting FED. R. CRIM. P. 33(a)).  Rule

33's "interest of justice" standard allows the grant of a new trial where substantial legal error has occurred. *United States v. Whittle*, 223 F. Supp. 3d 671, 675 (W.D. Ky. 2016), *aff'd*, 713 F. App'x 457 (6th Cir. 2017) (citing *Munoz*, 605 F.3d at 373). The court may grant a new trial on one of two grounds: (1) newly discovered evidence under Rule 33(b)(1); or (2) a motion "grounded on any reason other than newly discovered evidence" under Rule 33(b)(2). The burden is on the defendant to justify a new trial. *See United States v. Carson*, 560 F.3d 566, 585 (6th Cir. 2009). "The decision to grant or deny a motion for a new trial is entirely within the discretion of the district court, and [the Sixth Circuit] will not reverse absent a showing of an abuse of discretion." *United States v. Anderson*, 76 F.3d 685, 692 (6th Cir. 1996); *see also United States v. Farrad*, 895 F.3d 859, 885 (6th Cir. 2018); *United States v. Callahan*, 801 F.3d 606, 616 (6th Cir. 2015). "[S]uch motions should be granted sparingly and with caution." *United States v. Turner*, 995 F.2d 1357, 1364 (6th Cir. 1993); *see also United States v. Hughes*, 505 F.3d 578, 593 (6th Cir. 2007) (Rule 33 motions "are granted only in the extraordinary circumstance where the evidence preponderates heavily against the verdict." (citation and quotation omitted)).

### A. Individual Juror Challenges

Defendants argue that three jurors' viewing of Defendants while shackled and wearing jail clothes in the main lobby of the Owensboro Division Courthouse is grounds for a new trial. [DE 329 at 1622–23; DE 327 at 1609–10]. Reed argues that it was "clear via video evidence, that the jurors would have actually seen [Defendants] for some period of time even though they claimed they did not." [DE 327 at 1609]. Swanagan argues that the two jurors who said they did not recognize seeing Defendants may have been lying, and that more than the three jurors seen in the security footage viewed Swanagan in shackles and jail clothes. [DE 329 at 1623].

The Court has already denied a challenge to the three jurors at trial.  After the trial, the Court addressed these issues in a memorandum opinion and order explaining its basis for denying the challenge in more detail.  [DE 334 at 1676–80].  The Court explained that "[the Sixth Circuit] long ago concluded that 'a brief and fortuitous [viewing of the defendant in shackles] is not prejudicial and requires an affirmative showing of prejudice by the defendant."  [*Id.* at 1676 (quoting *Keys v. Booker*, 798 F.3d 442, 455 (6th Cir. 2015)) (quoting *Kennedy v. Cardwell*, 487 F.2d 101, 109 (6th Cir. 1973))]; *see also United States v. Watts*, No. 21-5302, 2022 WL 706603, at *7 (6th Cir. Mar. 9, 2022) ("[W]e do not assume prejudice when a juror inadvertently sees the defendant in shackles for a brief period elsewhere in the courthouse[.]") (quotations omitted); *United States v. Gayles*, 1 F.3d 735, 739 (8th Cir. 1993) (When a view of a defendant is "brief, inadvertent, and outside the courtroom, prejudice to the defendant is slight.").[1]  The Court also explained that when it "promptly address[ed]" the three jurors in a special voir dire session, it mitigated any prejudice to Defendants.  [*Id.* at 1677 (citing *United States v. Barger*, 931 F.2d 359, 371 (6th Cir. 1991) ("The trial judge in this instance questioned the juror in front of defense counsel, who did not object to the judge's handling of the matter. We reject the appellant's contention that he was prejudiced by this situation."))]; *see also United States v. Chipman*, 513 F.2d 1262, 1263 (6th Cir. 1977) (defendant was not denied a fair trial after being viewed by jury

---

[1] Reed cites one case for the proposition that the three jurors viewing of Defendants in shackles and jail clothes prejudiced defendants: *United States v. Waldon*, 206 F.3d 597, 607 (6th Cir. 2000).  [DE 327 at 1609].  But this case cuts against Reed's position rather than supporting it.  Explaining its decision, the Sixth Circuit stated in *Waldon*:

> The event occurred outside of the courtroom as part of a routine security measure, the district court properly queried both jurors regarding any potential prejudice to Waldon, and the two jurors assured the district court that their view of Waldon in handcuffs and shackles made no difference whatsoever in their decision. Under these circumstances, Waldon cannot carry his burden of showing actual prejudice. The district court did not abuse its discretion when it denied Waldon's motion for mistrial.

*Id.* at 608.

in handcuffs given trial judge's remedial measures); *Watts*, 2022 WL 70663, at *2 (holding defendant was not prejudiced where "the court questioned the juror about the incident" and the juror saw nothing "unusual" or "significant"); *United States v. Crane*, 499 F.2d 1385, 1389 (6th Cir. 1974) (defendant was not prejudiced by three jurors briefly viewing defendants in handcuffs on their way to the courtroom where trial judge questioned jurors afterward).  For the same reasons, the Court rejects Defendants arguments here.

After viewing the security footage during trial, the Court determined that only those three jurors entered the courthouse when Defendants were brought through the lobby in shackles and jail clothes.  [DE 334, n. 3].  A thorough voir dire of each of the three jurors revealed that only two of the jurors—Juror # 75 and Juror # 98—viewed individuals in jail clothes in the lobby, and both stated they did not recognize the individuals they saw in jail clothes.  [*Id.* at 1678].  Juror # 22 did not see Defendants at all, and Juror # 75 ultimately did not sit for deliberations because he was randomly selected as an alternate.  [*Id.* at 1678, 1680].  All three jurors affirmed they could remain fair and impartial, and the Court carefully assessed their credibility and demeanor.  [*Id.* at 1678].  On these facts, the Court determined at trial that Defendants made no "affirmative showing of prejudice."  [DE 334 at 1680].  For the same reasons, the Court now finds this is not a situation where the "interest of justice so requires" a new trial.

Reed makes one new argument in his motion, asserting that because he remained shackled while seated at defense table (but not in jail clothes) during the trial, "[e]very time the jury entered the courtroom . . . a juror could merely look down as they were entering the courtroom and see shackles on Defendant Reed."  [DE 327 at 1609–10].  This argument was never raised at trial, and is therefore waived.  *See Estelle v. Williams*, 425 U.S. 501, 512–13 (1976) ("[T]he failure to make an objection to the court as to being tried in [jail] clothes, for whatever reason, is sufficient to

negate the presence of compulsion necessary to establish a constitutional violation."); *Boykins v. Griffith,* No. 119CV00610TWPDML, 2023 WL 4034606, at *3 (S.D. Ind. May 31, 2023) ("[Plaintiff] has waived any objection to his trial attire—including legs shackles or handcuffs—because no objections were made at trial.").

Of course, "a criminal defendant has a right to remain free of physical restraints that are visible to the jury." *Deck v. Missouri*, 544 U.S. 622, 628 (2005). *Deck* cautions that a court cannot "without adequate justification, order[] the defendant to wear shackles that will be seen by the jury." *Id.* at 635. But here, the Court did not *order* Defendants to be shackled and sought to ensure the shackles would *not* be seen by the jury. Therefore, "without an objection or a request to be released from the shackles in which the accused has been transported to the court, the necessary element of compulsion does not exist." *United States v. Wilson*, No. 16-60212-CR, 2017 WL 11392599, at *2 (S.D. Fla. Sept. 27, 2017), *aff'd*, 979 F.3d 889 (11th Cir. 2020) (citing *Tarpley v. Dugger*, 841 F.2d 359, 361 (11th Cir. 1988)). Nothing in the record suggests that the jury saw either Swanagan or Reed shackled in the courtroom. As Reed himself acknowledges, he was not brought in or out of the courtroom in the jury's presence, so they would have had no occasion to view Reed's shackles. [DE 327 at 1610].

In fact, while it is unfortunately not reflected on the record, the Court engaged in a brief colloquy with Reed's counsel ensuring that Reed's shackles were covered by the tablecloth at Defendants' table. The Court confirmed with counsel that Defendants' shackles were out of view before the jury was brought in, and Reed's counsel appeared satisfied that they were covered. If Reed was concerned that the jury could see his shackles behind the table and tablecloth where he sat, or if he wanted to object to the shackles themselves, he could have done so during this colloquy

or at any point during trial.[2]  He did not, so "[f]ailure to object thus waives the issue."  *Id.* (citing

*Estelle*, 425 U.S. at 512–13).

For all the reasons stated above, Defendants' motions for a new trial on the grounds that

Defendants were prejudiced by the jury viewing them in shackles and jail clothes is **DENIED**.

### B.  Wiretapped Phone Call Interpretations

Swanagan argues that two witnesses, Detective Benjamin Fleury ("Fleury") and Detective

Kristin Dirickson ("Dirickson"), were improperly allowed to interpret conversations heard in

phone conversations obtained via wiretap involving Defendants over the objections of Defendants'

counsel.  [DE 329 at 1624].  Reed also argues that Swanagan's objection at trial should have been

sustained.  [DE 327 at 1608–09].  Swanagan concedes that the decision to admit recordings into

evidence rests with the trial court, [DE 329 at 1624 (citing *United States v. Vinson*, 606 F.2d 149

(6th Cir. 1979))], and that "recordings are generally admissible unless the incomprehensible

portions of the recordings are so substantial as to render the recordings as a whole untrustworthy."

[*Id.* (citing *United States v. Terry*, 729 F.2d 1063, 1068 (6th Cir. 1984)].  But Swanagan believes

the recordings were not "sufficiently audible and comprehensible for the jury to consider the

contents," therefore Fleury and Dirickson should have been prevented from interpreting the phone

conversations for the jury, allowing them to "draw their own conclusions from which coherent

portions of the intercepted calls they could make out."  [*Id.* at 1624–25 (citing *United States v.*

*Robinson*, 707 F.2d 872, 876 (6th Cir. 1994))].

---

[2] If counsel had objected to the shackles, a "clear showing of necessity" could have been made, *Kennedy v. Cardwell*, 487 F.2d 101, 111 (6th Cir. 1973), as the Court could have easily found they were needed "to prevent the escape of the accused" or "to protect" those in the courtroom.  *Woodards v. Cardwell*, 430 F.2d 978, 982 (6th Cir. 1970).  That is true because Swanagan already had a prior conviction for trafficking in a controlled substance in the first degree (schedule II, cocaine), and Reed had two prior convictions for trafficking in marijuana while in possession of a firearm and burglary in the first degree.

Although the recordings were difficult to hear at times,[3] Fleury's and Dirickson's testimony served primarily to offer their understanding of the conversations for the jury and what they did in their investigation based on that understanding, not to identify what exact words were being used. Swanagan's objection at trial focused on Fleury and Dirickson *interpreting* what was said, not whether the recordings themselves were generally audible and comprehensible.  The United States did not rely on Fleury and Dirickson to reveal what individuals on the recordings said, but rather, asked them what those statements *meant* to the investigation based on their personal involvement, and their training and experience.[4]

It is true that Fleury and Dirickson often summarized what they heard in the recordings after they were played.  At trial, the Court acknowledged and granted Defendants' objections, admonishing the United States to rephrase its questions on multiple occasions.  But even after a good-faith effort from the United States to illicit responses from Fleury or Dirickson that explicitly invoked the investigation itself, much of their testimony still in part summarized the recordings in that the contents of the call and its importance to the investigation were in large part one in the same.[5]  Yet, the mere fact that Fleury and Dirickson offered their own interpretation of the recordings does not mean they traversed into arguing the government's case, as counsel suggested at trial.  Indeed, it is hard to imagine how Fleury and Dirickson could have explained the

---

[3] While Swanagan is correct that the recordings were "garbled" at points, the core of the conversations heard on the recordings was clear.  [DE 329 at 1624].  They were not "as a whole untrustworthy."  *Terry*, 729 F.2d at 1068.

[4] Counsel for the United States explained in a bench conference that his point in asking these questions was to determine what in the phone calls was relevant to the investigation and why it was relevant.

[5] The Court notes that many of the calls explicitly referred quantities, costs and locations of specific drug sales.  As such, in response to several of the United States questions about what the call meant to the investigation, the witness was almost compelled to repeat the information in the call that was important to the investigation because it specifically stated what drugs were being sold, how much the drugs cost and where it was going to take place.  The contents of the call and its importance to the investigation were in large part one in the same.

recordings' relevance to their investigation without commenting at all on what was said in them. Interpreting the phone calls was not just part of their testimony at trial, but an integral part of the investigation itself—a process that both detectives took part in.

The Sixth Circuit has developed two main factors the Court must consider when a defendant challenges law enforcement testimony "interpret[ing] at trial, as a lay witness under Rule 701 of the Federal Rules of Evidence, ordinary English, non-technical words from the wiretap recordings."[6] *United States v. Smith*, 609 F. App'x 340, 345 (6th Cir. 2015).  In *United States v. Freeman*, 730 F.3d 590 (6th Cir. 2013), the Sixth Circuit held that a law enforcement agent's testimony interpreting wiretap recordings was improper because (1) he testified "based on his knowledge of the entire investigation as opposed to personal experiences," *Smith*, 609 F. App'x at 347 (discussing *Freeman*), and (2) it "consisted of many opinions and conclusions the jury was well equipped to draw on their own."[7] *Id.* (quoting *Freeman*, 730 F.3d at 597).  But other cases have upheld law enforcement testimony interpreting wiretap recordings where the agent "was familiar, based on personal involvement in the investigation and listening to multiple wiretap recordings, with the defendants' voices and their drug lingo." *Id.*

In *Freeman*, the government relied heavily on a special agent's testimony about seventy-seven wiretapped phone calls that were admitted as exhibits at trial.  730 F.3d at 594.  Importantly, while this case originated from a drug investigation, the defendant was on trial for murder.  *Id.* at

---

[6] These factors deal with the foundational requirements of Federal Rule of Evidence 701:

> If a witness is not testifying as an expert, testimony in the form of an opinion is limited to one that is: (a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

*United States v. Sutherland*, No. 11-20006, 2014 WL 7338724, at *1 (E.D. Mich. Dec. 22, 2014) (quoting FED. R. EVID. 701).

[7] Another court characterized these concerns as "not establish[ing] a proper foundation for his testimony under Federal Rule of Evidence 701" and "infring[ing] on the role of the jury by offering conclusive interpretations of the recordings."  *Sutherland*, 2014 WL 7338724, at *1.

592.  The agent was qualified as an expert to "testify to the meaning of specific code words and drug slang." *Id.* at 594.  When he strayed outside this expertise, the government contended his testimony was still proper under Rule 701 because it was "based upon his personal knowledge of the investigation." *Id.* at 594–95.  But this agent was not involved in the investigation, and instead "substantiat[ed] his responses and inferences with generic information" and "rel[ed] on the general knowledge of the FBI and the investigation as a whole." *Id.* at 596.  The agent then proceeded to interpret the phone calls and "broadly illustrate the prosecution's theory of the case," making conclusory assertions such as "[the defendant] is referring to the fact that he needs the payment he expects from . . . locating [the victim] . . . for the purpose of recovering the jewelry and killing him." *Id.* at 595.  The *Freeman* court held the testimony was improper.

In *Freeman*, the Court's primary concern was the "risk when an agent provides interpretations of the entire investigation . . . that he is testifying based upon information not before the jury, including hearsay, or at least, that the jury could think he has knowledge beyond what is before them[.]" *Id.* at 596 (quoting *United States v. Hampton*, 718 F.3d 978, 982–83 (D.C. Cir. 2013) (cleaned up).  It explained that the agent *"*testif[ied] to the meaning of numerous phone conversations irrespective of whether his testimony, at points, was mere speculation or relied on hearsay evidence." *Id.* The *Freeman* court's subsequent concern—that the agent was "form[ing] conclusions for a jury that they [were] competent to reach on their own"—was animated by the first concern that the agent did not testify from personal knowledge. *Id.* at 597.  Essentially, because the agent lacked personal knowledge related to the recordings, and because he was no longer testifying in his capacity as an expert, he was sitting in the same position as the jury and thus "infringed upon the role of the jury to decide what to infer from the evidence" by offering his own conclusions. *Id.* at 598; *see also United States v. Edwards*, 707 F. App'x 332, 337 (6th Cir.

11

2017) (characterizing this concern as "whether [testimony] explained what inferences the jury should draw, argued the government's case, interpreted plain language, or otherwise crossed the line from opinion to argument").

Two years after *Freeman*, the Sixth Circuit decided *Smith*. Like *Freeman*, *Smith* involved the testimony of an agent following a drug investigation that used wiretap recordings. 609 F. App'x at 345. And like *Freeman*, the agent's testimony in *Smith* offered interpretations of wiretap recordings that directly stated incriminating interpretations. *Id.* at 346. These included testifying that "'[I'm] going to try to do like . . . three this time, I'm going to have them throw me another one in there' meant that Smith was obtaining three ounces of cocaine instead of two"; that "'little brother' was a reference to Smith's cocaine supplier"; and that "you saved me" meant "not allowing [the defendant] to leave with cocaine that night." *Id.* But unlike *Freeman*, the *Smith* court reached a different conclusion because "[The Sixth Circuit] distinguished *Freeman* from situations where 'the phone calls included cryptic language, and the testifier explained what personal knowledge he used in interpreting that language.'" *Id.* at 347 (quoting *Freeman*, 730 F.3d at 598). At bottom, the two main differences between the agent in *Smith* and *Freeman* were: (1) "unlike the agent in *Freeman*, Agent Richardson interpreted the conversations based on personal knowledge as opposed to his general involvement in the investigation" and (2) "[t]he conversations interpreted [in *Smith*] [were] different than the conversations interpreted in *Freeman*" because the agent in

*Smith* was testifying about the drug investigation he participated in instead of a separate crime, such as the murder in *Freeman*.[8] *Id.* at 347.

Fleury's and Dirickson's testimony is more like *Smith*, falling on the permissible side of the *Freeman* factors.  First, Fleury and Dirickson were the lead investigators on this case, so they had intimate and personal involvement in the investigation, and their testimony was not based on general knowledge of the investigation.  *See Sutherland*, 2014 WL 7338724, at *2 ("[T]he record in the instant case establishes that [the law enforcement witness] was significantly involved with the surveillance that produced the recordings as well as the underlying activities discussed in the recordings[.]"); *see also Edwards*, 707 F. App'x at 337 ("[agent] testified that he was intimately involved in the investigation"); *Hall*, 20 F.4th at 1102 ("[agent] was very familiar with the investigation."); *Young*, 847 F.3d at 351 (6th Cir. 2017) ("Unlike the agent who testified in *Freeman*, the agent who testified in this case established a personal knowledge for his testimony."); *Williamson*, 656 F. App'x at 187 ("Unlike *Freeman*, in this case [agent] was intimately involved in the investigation[.]").  Fleury testified not only that he was involved throughout the investigation, but also that it was his responsibility to listen to wiretap calls.  Dirickson likewise testified that she was a primary investigator and had access to all electronic surveillance throughout the investigation, including the wiretap recordings.  This does not come

___

[8] Since *Smith*, several other cases have been distinguished from *Freeman*.  *See United States v. Hall*, 20 F.4th 1085, 1102 (6th Cir. 2022) (distinguishing *Freeman* where testimony was based on personal knowledge and "the calls at issue in [the agent's] testimony involved enough slang and jargon such that [the agent's] testimony concerning what [defendants] were discussing would be helpful to the jury.") (citation and internal quotations omitted); *Edwards*, 707 F. App'x at 337, 338 (6th Cir. 2017) (distinguishing *Freeman* where agent was "intimately involved in the investigation" and testimony "was simply explaining what [the defendant] meant."); *United States v. Young*, 847 F.3d 328, 351 (6th Cir. 2017); *United States v. Williamson*, 656 F. App'x 175 (6th Cir. 2016); *United States v. Kilpatrick*, 798 F.3d 365, 381 (6th Cir. 2015) ( "few" of the witness's statements "could be characterized as arguing the government's case"); *Sutherland*, 2014 WL 7338724, at *3 ("Agent Fleming's testimony related to the recorded conversations in the instant case is distinguishable from the testimony provided by the agent in *Freeman* because Agent Fleming's testimony was based on his personal knowledge and perceptions.").

close to the agent's lack of foundation in *Freeman*. *See Kilpatrick*, 798 F.3d at 380 ("The testimony in *Freeman* was so egregious that the government conceded at oral argument that the agent 'lacked the first-hand knowledge required to lay a sufficient foundation for his testimony under Rule 701(a).'") (quoting *Freeman*, 730 F.3d at 597)).

Second, portions of their testimony were offered to interpret specific drug-related jargon that the jury might not otherwise understand. *See Smith*, 609 F. App'x at 347 (agent became familiar with "specific code words defendants used to reference drugs and drug related activity") (citing *United States v. Dugalic*, 489 F. App'x 10, 16 (6th Cir. 2012) ("This court has repeatedly recognized that, in drug cases, officers can testify as to the meaning of code words.")). For instance, Fleury interpreted the word "zips" to mean ounces, the term "skates" to mean scales, and the term "action" to mean methamphetamine, and Dirickson interpreted the term "whip" to mean vehicle. These were permissible.

Third, Fleury and Dirickson "informed the jury as to the bases for [their] understanding of the recordings, which therefore permitted the jury the opportunity to evaluate [their] testimony and draw their own conclusions." *Sutherland,* 2014 WL 7338724, at *3; *see also Edwards*, 707 F. App'x at 338 (agent was "interpreting the meaning" and "not adding some impermissible gloss that pushed the jury in the direction the government wanted it to go"). That is important because "[*Freeman*'s] 'conclusive interpretation' defect is inextricably intertwined with the underlying foundational defect." *Sutherland*, 2014 WL 7338724, at *2 (quoting *Freeman*, 730 F.3d at 598). Fleury and Dirickson did offer their own interpretations of the recordings, often summarizing what they understood the individuals in the recordings to be discussing, but did so by drawing from their personal knowledge from the investigation as the Court instructed after Swangan's objection.[9]

---

[9] Swanagan's counsel initially agreed with the Court at trial that Fleury and Dirickson could testify as to what the calls meant to them, but not what the call actually said.

And unlike the agent in *Freeman*, Fleury and Dirickson did not "[substantiate] [their] responses and inferences with generic information and references to the investigation as a whole" or "effectively [tell] the jury that they were not as qualified as [them] to interpret the phone calls." 730 F.3d at 596, 598–99; *see also Edwards*, 707 F. App'x at 338 (holding testimony was "not an improper interpretation because [the agent] was providing an explanation of the context and meaning of the conversation in light of his work on the investigation").  As the United States pointed out in a bench conference after an objection at trial, Dirickson was listening to the wiretapped conversations live, and so her interpretations were based entirely on her personal knowledge as the investigation developed in real time.

Ultimately, this was not a situation where a witness "effectively spoon-fed his interpretations of the phone calls and the government's theory of the case to the jury" because, unlike *Freeman*, the witnesses in this case did not "[fail] to explain the basis of [their] interpretations—what experience [they] had that the jurors themselves did not have[.]" *Freeman*, 730 F.3d at 597.  And even though Fleury's and Dirickson's interpretations summarized the recordings, they did not "cross[] the line from evidence to argument." *Kilpatrick*, 798 F.3d at 380–81 (distinguishing *Freeman*).  Because they fulfilled the foundational requirements of Rule 701— the core concern of both *Freeman* factors—the jury was free to view their testimony as credible or not credible.  For these reasons, Fleury and Dirickson's testimony does not run afoul of the two concerns outlined in *Freeman*.  Accordingly, Defendants motion for a new trial on this ground is **DENIED**.

### III.  Conclusion

For the reasons stated above, and the Court being otherwise sufficiently advised, Defendants motions for judgment of acquittal and motions for a new trial [DE 327; DE 329] are **DENIED**.

Rebecca Grady Jennings, District Judge
United States District Court

January 9, 2024

cc: counsel of record